Argued and submitted November 12, 1998, reversed and remanded for reconsideration February 23, 2000

In the Matter of the Compensation of
Laura R. Franke, Claimant.

Laura R. FRANKE,
*Petitioner,*

*v.*

LAMB-WESTON, INC.,
*Respondent.*

(96-04464; CA A102043)

997 P2d 876

R. Adian Martin argued the cause and filed the brief for petitioner.

Steven T. Maher argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler,* Judges.

EDMONDS, P. J.

Armstrong, J., concurring.

---

* Kistler, J., *vice* Warren, P. J., retired.

## EDMONDS, P. J.

Claimant seeks review of an order of the Workers' Compensation Board (Board) that held that claimant had not carried her burden of proving that her current condition is work related. We review for errors of law and for substantial evidence and reverse. ORS 183.482(8).

After an appeal by claimant from the administrative law judge's (ALJ) order that upheld employer's denial, the Board adopted and affirmed the ALJ's order. The ALJ found that on May 25, 1995, claimant was injured at work when she experienced neck and shoulder pain as a result of turning over boxes of product. She was treated by various doctors in early June 1995, and Dr. Oltman became her attending physician on June 13. He concluded that claimant had suffered a soft tissue injury with possible nerve irritation, and he prescribed treatment consisting primarily of physical therapy. He released claimant to go back to light work as of July 2, 1995, and employer accepted claimant's claim as a cervical strain condition.

Claimant was still experiencing symptoms in September 1995, and Oltman referred her to a neurosurgeon. As a result of his examination and a MRI, the neurosurgeon suggested treatment by a pain clinic. Claimant declined, requesting instead, a second opinion. Thereafter, she was seen by Dr. Keenen, who concluded that claimant had a cervical strain without evidence of disc herniation. He recommended physical therapy and claimant was taken off work.

In November 1995, claimant was evaluated by a panel of examiners. Dr. Laycoe and Dr. Watson indicated that they believed that claimant was suffering from chronic neck pain because of the over-use of her neck. They found no evidence of cellular or intervertebral disk problems. They did note that "functional overlay" was present. Dr. Davies, a psychologist, opined that "secondary gain" factors were present.

Claimant returned to work in January 1996. She underwent a second medical examination in April 1996 with Drs. Wilson and Klecan. The ALJ found,

"* * * Dr. Wilson speculated claimant could have had an overuse syndrome without objective findings. In his opinion claimant was medically stationary with no further treatment needed and no impairment. The major cause of claimant's condition, he added, was non-organic findings as opposed to the May 25, 1995 injury. Psychiatrist, Dr. Klecan, found no mental disorder or personality disorder present. Like Dr. Davies, he believed secondary gain factors were operating. Although, agreeing some somatization[1] was present, Dr. Oltman otherwise declined to concur with the IME opinions.

"On April 30, 1996, as amended on May 2, 1996, the employer issued a current condition denial on the basis the major cause of the present condition was no longer the May 25, 1995 injury."

On May 8, 1996, claimant returned to Keenen, who recommended anesthetic and steroid injections in claimant's cervical area. Subsequently, Dr. Slack administered several injections to claimant's spine. Thereafter, claimant rated her pain level as zero on a scale from 1 to 10 in response to Slack's inquiry after receiving the injections. Before the hearing with the ALJ occurred, Oltman was deposed. Based on Slack's report regarding the effect of the injections, he opined that claimant's current condition was a physical result of her work injury.

In the part of her opinion labeled "CONCLUSIONS OF LAW AND OPINION," the ALJ explained her reasoning in arriving at the conclusion that claimant had not carried her burden of persuasion and why she rejected Oltman's opinion.

"On April 4, 1996, Drs. Wilson and Klecan examined claimant. In their respective reports, they concluded claimant's present condition was subjective only, i.e., not an illness, injury or condition in the usual sense. Dr. Klecan explained nonanatomical and noninjury factors were now operating as the major cause. Prior to closure, and relying on the April 4, 1996 report, the employer issued a current

---

[1] "Somatization" is defined as "the production of physiological disfunction often resulting in irreversible structural changes by the exaggeration and persistence of an emotional state." *Webster's Third New Int'l Dictionary*, 2171 (unabridged ed 1993).

condition denial on the basis the accepted May 25, 1995 injury was no longer the major contributing cause of claimant's chronic condition. ORS 656.262(7)(b).

"The evidence establishes claimant sustained a cervical injury on May 25, 1995. Despite extensive medical attention the injury developed into a chronic condition. Improvement has proven to be elusive. Thorough diagnostic testing has not revealed a physical basis for claimant's continuing symptoms.

"Moreover, the medical issue has been compounded by the presence of psychological factors. Although not diagnosing a psychiatric illness or disorder, Dr. Klecan has described the noninjury factors as twofold: (1) a personal style of anxious, somatic over focus, and (2) external rewards coming in response to her anxious somatic over focus. Dr. Wilson described claimant as being very over focused on her somatic complaints. Dr. Keenen's reports also suggest he does not disagree that a psychosomatic element is present. Even claimant's attending physician, Dr. Oltman, has acknowledged the presence of some somatization. The evidence further supports the finding psychological factors combined with the May 25, 1995 injury to produce a combined condition.

"In this regard, ORS 656.005(7)(a)(B) provides that if a otherwise compensable injury combines at any time with a preexisting disease or condition to cause or prolong disability or the need for treatment the combined condition is compensable only if, so long as and to the extent that the otherwise compensable injury is the major contributing cause of the disability of the combined condition or the major contributing cause of the need for treatment of the combined condition. Under the statute, the quantitative contribution of each cause must be weighed to establish the primary cause of claimant's need for treatment. *SAIF v. Nehl*, 148 Or App 101, *on recon* 149 Or App 309 (1997).

"The preponderance of the evidence establishes claimant's current cervical condition is not supported by objective findings of a physical injury. This is the assessment of the doctors who have examined claimant. Even assuming, the presence of residuals from the May 25, 1995 injury, the evidence is not convincing the injury remains the major contributing cause of claimant chronic cervical condition.

Rather, the evidence points to psychological factors in explaining claimant's current condition.

"In contrast, it was the opinion of Dr. Oltman [that] claimant's continuing symptoms were due to a physical as opposed to psychological condition based on the fact claimant showed improv[ement] after being injected by Dr. Slack in late May 1996. *In his deposition Dr. Oltman stated that if claimant had declared 100 percent improvement within a few minutes of being injected, he would have suspected more of a psychological component. As it was, she had a history of delay with substantial improvement noted 10 days post injection* leading Dr. Oltman to think inflammation was present in the area injected. Thus, he was more convinced of a physically based condition.

"*Review of Dr. Slack's report, however, does not correspond to a delayed response. He records that claimant reported immediate improvement.* While at his office, using a pain scale of 1 to 10, she gave a pain level of 0. In other words, shortly after the injections claimant was reporting she was pain free. This history casts doubt on the medical history relied on by Dr. Oltman in forming his opinion. As a consequence, his opinion is weakened.

"Accordingly, for the above reasons, I find the weight of evidence does not establish the May 25, 1995 injury was the major contributing cause of her disability and need for treatment of the combined condition. * * *" (Exhibit references omitted; emphasis added.)

■ On review, claimant makes two assignments of errors. The first assignment says, "The Board erred * * * in not addressing the procedural validity of [the] denial." Claimant argues that because she has made no claim for the compensability of a psychological condition or for a combined condition, the Board was without "jurisdiction" to uphold employer's denial. Employer responds,

"Here, the Board had jurisdictional authority precisely because the matter at issue involved a worker's right to receive compensation. Claimant's sole purpose for requesting a hearing on May 8, 1996 was to gain compensation for the current cervical condition, which was denied by the employer. At the hearing level, claimant framed the issue as 'whether or not the denial should be set aside—benefits according to law.' Claimant's opening argument clearly

states that 'the medical bills need to be paid and she needs her time loss and her expenses for seeing her doctors down in Portland.' Without claimant's attempts to gain compensation for a condition that she claims is work related, there would not have been a matter concerning a claim, and neither the Hearings Division nor the Board would have had jurisdiction. However, because claimant's case involves her right to receive compensation for an injury that she claims is work related, both the Hearings Division and the Board have jurisdiction pursuant to ORS 656.726(2) and 656.704(3)." (Internal references omitted.)

ORS 656.704(3) provides:

"For the purpose of determining the respective authority of the director and the board to conduct hearings, investigations and other proceedings under this chapter, and for determining the procedure for the conduct and review thereof, matters concerning *a claim under this chapter are those matters in which a worker's right to receive compensation, or the amount thereof, are directly in issue.* However, such matters do not include any disputes arising under ORS 656.245, 656.248, 656.260, 656.327, any other provisions directly relating to the provision of medical services to workers or any disputes arising under ORS 656.340, except as those provisions may otherwise provide." (Emphasis added.)

As employer points out, claimant's position before the hearings division and the Board triggered the provisions of ORS 656.704(3) because her requests constituted a "claim." Accordingly, the Board has jurisdiction over this matter.

■ In her second assignment of error, claimant contends: "Substantial evidence does not support the decision of the ALJ[.]" We examine the record as a whole to determine whether or not there is substantial evidence to support the ALJ's findings in this case and whether her conclusion is based on substantial reason. ORS 183.482(8)(c).[2] The ALJ discounted Oltman's opinion because Oltman interpreted Slack's report to say that claimant reported delayed relief from the injections. Instead, the ALJ understood Slack's

[2] The statute provides, in part:

"Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

report as saying that claimant had immediate relief from pain after the injections, a response that would be more consistent with a psychological reaction to the injections. According to claimant, the Board's opinion is not supported by substantial evidence because "the ALJ misstated critical medical evidence."

In his report, Slack recounted that he gave claimant injections, and immediately after the procedure, the claimant evaluated her pain as "zero." The injections apparently included a local anesthetic and a steroid that was intended to have a long term anti-inflammatory effect. He also gave claimant a prescription for pain control. Slack then included in the last page of his report claimant's evaluation of her condition after treatment. In that evaluation, claimant stated that on the evening of the treatment, her neck symptoms were worse than before or were the same as before. Thereafter, she experienced gradual improvement over a ten-day period and subsequently, she reported substantial improvement in all areas. Thus, the last portion of Slack's report supports Oltman's opinion that claimant's delayed response to the treatment demonstrates that her condition is not psychological. On the other hand, a claim of immediate relief from the steroid injection by claimant, if made, could be inconsistent with Oltman's reasoning and render it suspect.

In reviewing the Board's order for substantial evidence, it is not our role to determine which understanding of Slack's report is correct or what role it plays in the overall evaluation of the weight of the evidence. However, in *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990), the court explained: "If a finding is reasonable in light of counterveiling as well as supporting evidence, the finding is supported by substantial evidence." In that case, the structure of the ALJ's opinion is curious. She reaches her conclusion about the weight of the evidence and whether the evidence is persuasive regarding the issue of the cause of claimant's complaints apparently before she considers Oltman's report. Also, we cannot discern from her opinion whether her discounting of Oltman's opinion was the result of weighing all of the evidence and whether she considered, in rejecting his opinion, Oltman's reliance on claimant's report to Slack about her condition after the local anesthetic wore

off. Regardless, it was incumbent on the Board to weigh all of the evidence before it reached its conclusion. If, in fact, the ALJ's opinion on which the Board relied failed to consider the report by claimant of her gradual improvement over a ten-day period after the injections were administered, then that omission was error under *Garcia*. Accordingly, remand is required for the Board to consider claimant's claim in light of the entire medical record including the medical reports that pre-date Slack's treatment.[3]

Reversed and remanded for reconsideration.

**ARMSTRONG, J.,** concurring.

I agree with the majority that the Board's treatment of Dr. Slack's report and Dr. Oltman's testimony concerning the cause of claimant's current condition requires reversal and remand to the Board. I write to emphasize that, in my opinion, the Board could not possibly find, on this record, that claimant's current condition is primarily psychological in nature rather than a physical result of her compensable injury.

Although there is evidence in the record that suggests that the cause of claimant's current condition was primarily psychological, all of that evidence precedes Slack's treatment and thus does not take the results of the treatment into account. Those opinions were based on the best information available at the time, but they are now outdated. When one reads Slack's report of his treatment in conjunction with Oltman's explanation of it, the only possible conclusion is that, contrary to those earlier opinions, claimant's current condition is primarily physical in nature and is the result of her compensable injury. The record does not currently contain any substantial evidence to support any different result. Because the heart of the Board's error was its failure to understand what Slack's report contained and what Oltman explained in his testimony, I will discuss those things in some detail.

---

[3] Contrary to the concurrence's assertion, it is for the Board on remand to assess the relative weight of the various medical opinions in the record.

An essential part of the foundation for the Board's decision was its conclusion that the positive results of the steroid injections that Slack administered were best explained by psychological rather than physical factors. Neither Slack nor any other expert who was aware of Slack's report gave an opinion that directly supported that conclusion. Oltman was the only physician who knew of Slack's report when he gave his opinion, and his opinion supported the compensability of claimant's current condition. Rather, the Board misunderstood Slack's report in a way that led it to discount Oltman's opinion and to fall back on the opinions that other physicians had given before claimant saw Slack.

The Board correctly noted that Slack's report showed that claimant experienced immediate relief from the injections; however, it incorrectly assumed that the report also showed that the relief was permanent. Oltman, on the other hand, correctly understood, from Slack's report and from claimant's direct statements to him, that claimant's permanent improvement had been gradual, not immediate. He testified that improvement to a physical problem would have occurred over a period of time, while immediate improvement would suggest a psychological cause. Because the Board failed to understand Slack's report, it saw Oltman's testimony as inconsistent with the result of Slack's treatment. As a result of that perceived inconsistency, the Board discounted Oltman's opinion of the cause of claimant's current condition. However, the only possible reading of Slack's report as a whole is that claimant's permanent improvement was gradual, which is consistent with Oltman's opinion and deprives the previous contrary opinions of any substantial evidentiary value.

Slack's report contains four pages. The first three pages are his summary of claimant's condition and his description of the procedures that he employed. He noted that before the procedure claimant rated her pain at three on a scale of one to ten, stating that it was lower than usual because she had not worked for the previous week. He then described the procedures, which involved first anesthetizing the skin in claimant's neck and then inserting needles in four different positions. Slack injected a combination of Celestone Soluspan and Marcaine through three of the needles; in the

fourth he injected only Marcaine to anesthetize several nerve branches. Immediately after the procedures, claimant reported her pain as zero on a scale of one to ten.

The fourth page of Slack's report, which the Board appears to have ignored, was claimant's report of her condition in the ten days following the treatment. She reported that on the evening of the day of treatment her neck pain was worse and her arm and shoulder pain were the same as before the treatment. Three days later her neck pain continued to be worse, but she had some improvement in her arm and shoulder pain. Seven days after treatment she had some improvement in the neck and substantial improvement in the arm and shoulder. Finally, ten days after treatment she had substantial improvement in all areas.

In his deposition, Oltman discussed his understanding of the nature of Slack's treatment:

"He used Marcaine, which is a local anesthetic, you know, for trying to make sure he found the spot that was definitely causing pain. And then he injected a steroid into that area. So, I mean, the celestone band, the soluspan that he mentions on the second page is the steroid that he gave.

"And the lidocaine and Marcaine — he used both kinds — is more like a local anesthetic like, of course, the dentist gives you before surgery. And that, of course, is a brief one, a short-acting sort of thing, just to try to find the area that is bothering them.

"And the celestone is the cortisone type of medication that lasts for several — you know, probably several weeks or more and is the one that, you know, no doubt actually did the good that she needed."

Oltman emphasized that the steroid was the drug that actually treated the cause of claimant's problems by attacking the inflamation in her neck. Although he recognized that there might be a psychological component to claimant's condition, he believed, based in large part on her reaction to Slack's treatment, that it played a minor role.

Oltman explained his reasons for rejecting a psychological explanation in his answers to questions from Lamb-Weston's attorney about the nature of claimant's response to

the treatment. He first noted that, based on her statements to him, claimant eventually had a substantial improvement from the injection. The first few days after treatment she felt flu-like and not really well, but by the fifth day she was feeling substantially improved. For a period she felt almost as though she did not have a problem, but then some mild aches and stiffness returned. Despite that problem, she thought that she could put in a full day's work if she were able to take a break. Oltman continued:

"So that kind of a response when a person is unable to do much work at all, and then they come back and say, 'Hey, you know, I think if I have a little break, I feel I'm enough better that I probably can put in a full eight-hour day,' that's not a typical response you would get from somebody who is trying to get out of work or trying to make a case of something that's not really there.

"And the way that she responded to the injection also seems to be like I've already described; a typical, normal response to the beneficial effect of medicine rather than a psychiatric response.

"Q. What is a typical response from a psychiatric level of something like this?

"A. I think most people, if they've decided that's all the gain they are going to get from a particular thing, and they're looking for some cure, and then they get an injection, they would probably notice a fairly immediate benefit, long lasting, and without any waxing and waning of symptoms, and so forth and so on. I think it would be an all-or-nothing phenomenon."

The Board rejected Oltman's opinion and concluded that claimant's condition was based on psychological factors, primarily because Oltman based his opinion on his understanding that claimant's condition had improved over a period of time rather than immediately after the treatment. The Board stated that

"[r]eview of Dr. Slack's report, however, does not correspond to a delayed response. He records that claimant reported immediate improvement. While at his office, using a pain scale of 1 to 10, she gave a pain level of 0. * * * In other words, shortly after the injections claimant was reporting she was pain free. This history casts doubt on the

medical history relied on by Dr. Oltman in forming his opinion. As a consequence, his opinion is weakened."

I agree with claimant that the only reasonable way to read her statement that her pain was zero on a scale of one to ten after the treatment is that it referred to the immediate reduction in her pain that was a result of the local anesthetics that Slack administered, not to the long-term results of the steroid treatment. In reviewing the Board's order for substantial evidence, we must examine the order in light of the record as a whole, which means that we must consider the evidence that detracts from the Board's conclusion as well as the evidence that supports it. *See* ORS 183.482(8)(c). "If a finding is reasonable in light of countervailing as well as supporting evidence, the finding is supported by substantial evidence." *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990). Here, substantial evidence does not support the Board's finding that claimant experienced an immediate and permanent improvement in her condition as a result of Slack's treatment, rather than the gradual improvement that Oltman described. The only conclusion that the record does support is that Slack's injections were effective because they treated the physical cause of claimant's current condition.

Although Slack stated that, immediately after the procedure, claimant rated her pain as zero, he also gave her a prescription for post-block pain control, which might suggest that he did not expect her immediate improvement to last. More significantly, claimant's own evaluation of her condition after the treatment, which, as I noted, is part of Slack's report, shows that on the evening after the treatment her symptoms were as bad as or worse than they had been before. She thereafter experienced gradual improvement until ten days later, when she reported substantial improvement in all areas. Slack's report as a whole, thus, is consistent only with claimant's description of her symptoms to Oltman and is inconsistent with the Board's finding.

It is impossible both to treat claimant's evaluation of her progress as genuine and to read Slack's report in the way that the Board read it. If claimant had experienced immediate and total relief from the treatment, and if, as the Board

necessarily found, that immediate and total relief had been permanent, then she would not have had the slow steady progress that she chronicled in the evaluation. Unless the Board allows new evidence on remand that significantly alters the picture that the current record provides, the only reasonable conclusion that the Board can reach is that claimant's current condition is a direct physical result of her injury and, therefore, is compensable.